UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANGEL ENRIQUE ROMERO GALINDEZ,
#17931-069,

          Plaintiff,

   v.

FAISAL AHMED and K. SCHNEIDER,

        Defendants.

Case No. 3:21-cv-01045-JPG

**MEMORANDUM AND ORDER**

This matter comes before the Court on the Defendants' motion for summary judgment. (Doc. 39). Finding that neither Physician's Assistant Schneider nor Dr. Ahmed were deliberately indifferent, the Court **GRANTS** the motion.

## I.    BACKGROUND

### A.  Procedural Background

Plaintiff Angel Enrique Romero Galindez ("Galindez"), an inmate in the custody of the Federal Bureau of Prisons (BOP) and currently confined at the Federal Correctional Institution located in Greenville, Illinois (FCI-Greenville), filed this action for constitutional deprivations by persons acting under color of federal authority pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). (Doc. 1). In the complaint, Galindez claims the Defendants caused him to suffer from extreme pain when they denied his request for surgery to replace failed hardware in his left leg. He requested monetary and injunctive relief.

The Court screened the complaint and allowed Galindez to proceed with an Eighth Amendment claim against the Defendants for denying him adequate medical care for his left leg injury at FCI-Greenville beginning in 2020. (Doc. 6). Galindez filed virtually the same complaint

1

a year earlier in *Galindez v. Ahmed, et al.*, Case No. 20-cv-00655-JPG (S.D. Ill. 2020) ("prior action"). Although the complaint survived screening on the same claim, the prior action was dismissed without prejudice on summary judgment because Galindez did not exhaust his available administrative remedies before bringing suit. (Doc. 97, prior action). Before refiling his complaint in this case, Galindez exhausted his remedies, and Defendants did not raise his failure to exhaust as an affirmative defense in their answer on December 6, 2021. (Doc. 23).

A week after the scheduling and discovery order was entered, the Defendants filed for summary judgment on the merits on December 15, 2021. (Doc. 30). Citing Federal Rule of Civil Procedure 56(b), the Defendants pointed out that a party may seek summary judgment "at any time." (*Id.*). They asserted that the issues in this case were "fully briefed" on summary judgment in the prior iteration of this lawsuit. (*Id.*). They also relied on testimony given at two preliminary injunction hearings in the prior action. (*See* Docs. 37,93; prior action).

In their brief, the Defendants provided a summary of Galindez's medical care that begins over twenty-five years before he filed suit—when a bullet shattered his femur—and continued through September 2021—a month after Galindez filed this action. This, after they noted that Galindez's current complaint only "contains factual allegations that run through the summer of 2020" and "ignores the totality of the medical care that was provided during the timeframe and the 18 months since." (Doc. 30). The Defendants summarized the "relevant medical treatment" in seven pages of their brief. (*Id.*). Based on this summary, the Defendants asked the Court to find that they were not deliberately indifferent to Galindez's medical needs because they had exhausted pain management options and then referred him for surgery. (*Id.*). Acting *pro se*, Galindez opposed summary judgment on the merits. (Doc. 33).

On September 23, 2022, the Court denied the prior motion for summary judgment without prejudice on the grounds that it was premature. (Doc. 37). On May 18, 2023, the Defendants again moved for summary judgment. (Doc. 39).

### B. Factual Background

Over twenty-five years ago, Galindez was shot in the leg. (Doc. 39). This gunshot wound shattered his femur. He underwent an Open Reduction Internal Fixation ("ORIF") where some hardware—a metal rod with interlocking screws—was implanted to hold his shattered femur in place. (Docs. 39, Ex. A; 42). In 2013, imaging of the hardware indicated no complications, but showed that there had been some ossification i.e., bone growth, around the hardware. Between 2015 and 2018, Galindez was outside of BOP custody. During his prison term, he complained of intermittent, chronic pain in the area—usually in response to changes in weather.

In February 2019, Galindez was transferred to FCI Greenville where Dr. Ahmed is the clinical director and supervisor for nurses, mid-level practitioners, and other clinical personnel involved in FCI Greenville's inmate medical care and treatment. (Doc. 39, Ex. A). Upon his arrival, on February 25, 2019, Defendant Physician Assistant ("PA") Schneider performed an intake health screening. At the time Galindez did not complain of any pain. (Doc. 39, Ex B).

On February 20, 2020, a year after arriving at FCI Greenville, Galindez began complaining that his hardware implant was causing him pain. He was seen by Registered Nurse ("RN") Jolliff, who is not a party to this lawsuit. (Doc. 39, Ex. B). On February 25, Galindez's leg was x-rayed. There were no observable changes from the 2013 x-ray; the hardware appeared stable and there were no signs of abnormalities. A follow-up was scheduled with a different PA, PA Mills—who is also not a party to this lawsuit—for March 2, 2020. (Doc. 39, Ex. B). At that follow-up, Galindez was prescribed Duloxetine for the pain. However, by April 2020, Galindez still complained of pain. Galindez had a follow-up appointment scheduled, but the appointment

was postponed by COVID-19. During that time, the jail's medical personnel prioritized and focused on infectious disease.

On June 3, 2020, medical records indicate that PA Schneider interacted with Galindez during a triage encounter.[1] During that triage encounter, Galindez restated that he was suffering leg pain and that he wanted the rod removed. Schneider scheduled Galindez for a follow-up appointment and made a note for PA Mills. Schneider had no further interactions with Galindez.

On June 10, 2020, a week after seeing PA Schneider for triage, Galindez was seen by Defendant Dr. Ahmed. Dr. Ahmed explained that the x-ray did not show structural problems or hardware failure. Ahmed believed the best treatment plan was pain management through medication and, accordingly, doubled his dose of Duloxetine. Galindez disagreed with Ahmed. Galindez insisted on immediately moving to surgical removal of the hardware. Ahmed informed Galindez that he did not believe removal was medically appropriate given the x-ray indicated there was no hardware failure nor anything that appeared to be the cause of his pain. Ahmed believed the appropriate course of action was to begin with pain management, increase dosage of pain medication, and reevaluate over time. After Galindez's first appointment with Ahmed, Ahmed used an interpreter to try and communicate more effectively.

Between July and August, 2020, Galindez reported increasing pain. He claimed his pain was ten out of ten on the pain scale. Despite these complaints, Galindez exhibited the same range of motion and ease of ambulation, he did not exhibit any obvious signs of discomfort, and he was able to put his full weight on his leg. Galindez refused to cooperate with pain medication and demanded surgical removal.

---

[1] This was only the second time Galindez was seen by PA Schneider. The first time he was seen by PA Schneider was at his initial intake at the jail in February of 2019—when Galindez had not yet complained of leg pain.

On August 28, 2020, Dr. Ahmed saw Galindez again, with the assistance of a telephone interpreter. "The visit was extensive, lasting approximately 40 minutes." (Doc. 39, Ex. A). Once more, Galindez was "ambulatory with full weight bearing without an assistive device." (*Id.*). Galindez stated that his leg was still bothering him and that he wanted surgical removal of the hardware. Galindez claimed he was allergic to the metal in his hardware and had stopped taking his pain medication. Ahmed responded by again explaining to Galindez, through an interpreter, that surgery was inappropriate. Ahmed conveyed that serious risks accompanied surgery that could exasperate the issue, cause irreversible damage, and—even if successful—that he "was almost certain to continue experiencing pain such that surgery would not fully resolve his current complaints." (*Id.*). Ahmed also explained that chronic pain is normal in these kinds of situations. As Galindez did not want to take the prescribed Duloxetine, Ahmed wished to switch to another medication. However, Galindez told Ahmed that he would refuse all medication and "would only accept surgery as a solution." (*Id.*).

On September 10, 2020, to confirm that nothing had changed in the intervening seven months, Dr. Ahmed ordered another x-ray. Again, the results remained the same: no indication of structural failure or anything else that may be the cause of the pain. Dr. Ahmed saw Galindez a few days later, on September 14, 2020. During that appointment Ahmed explained that the x-ray did not indicate there was a need for surgery and that the recommended course of action was pain management. However, Galindez still refused medication and demanded surgery. In his declaration, Dr. Ahmed states:

> Based upon these diagnostic tests and my own evaluation of [Galindez], I saw no medical basis that would support a surgical consult at that time. I felt that pain management should first be tried to confirm whether his discomfort could be relieved through conservative means, rather than pursuing an invasive surgery with its associated risks. At that point, the intramedullary rod had been present for roughly 25 years after a gunshot wound and was placed in the inner core of his

5

femur with noted ossification. Moreover, the radiology [results] confirmed the hardware was intact, with no soft tissue abnormalities, no fracture, and no joint space misalignment. While he did report pain, as commonly occurs in long-term hardware placement, he appeared to ambulate without difficulty and displayed normal range of motion.

(Doc. 39, Ex. A).

On September 28, 2020, Galindez was seen by PA Mills. Galindez claimed that the Duloxetine caused him to vomit and that ibuprofen was ineffective. Again, PA Mills observed no change in the way Galindez walked or moved. Galindez did not favor his other leg, nor did he have difficulty getting on the exam table. There were some limits on his range of movement, but no grinding or popping of the hip. After this appointment however, Galindez indicated he was finally willing to pursue medication and agreed to trying NSAIDs. In response, PA Mills discussed Galindez's visit with Dr. Ahmed. In light of his willingness to try medication, Ahmed ordered prescription-strength Naproxen twice a day with possible steroid injections. They "planned to proceed with a gradual, step-wise increase of alternative or additional pain medications in order to pursue the most effective treatment . . . with further modification . . . as supported by his presentation over time." (*Id.*).

On November 25, 2020—around sixty-days after his previous appointment—Ahmed saw Galindez again. Galindez said that the Naproxen was insufficient to alleviate his pain. In response, Ahmed prescribed additional medications: prescription strength Tylenol, Lidocaine patches, and Oxcarbazepine.

On February 3, 2021—around sixty-days since his November appointment—Galindez was seen by Ahmed again. He reported that the prescriptions helped alleviate the pain for a few hours, but it had not resolved. [2] Determining that pain management options had been exhausted,

---

[2] Galindez states that the lidocaine patches were the only thing able to alleviate his pain. (Doc. 43).

Ahmed referred Galindez to St. Louis University Hospital for an orthopedic specialist to determine next steps, including surgery, if needed.

On April 14, 2021, Galindez filled out a sick call request with PA Mills. He told PA Mills that the medication was not helping and he requested Gabapentin. Mills informed him that, as an appointment with a specialist had been scheduled, they would not prescribe more pain medication until they determine next steps.

On April 22, 2021, Galindez was seen by the orthopedic specialist, Dr. Kuldjanov. Dr. Kuldjanov discussed options with Galindez and reiterated the significant risk associated with surgery including "bleeding, infection, blood clots, neurovascular injury, malunion, nonunion, painful hardware, hardware failure, need to reoperat[e], risk of anesthesia, risk of life and limb." (Doc. 39, Ex. A). There was no indication that the need for surgery was urgent or immediate. Galindez still wanted surgery. As a result, he was scheduled for surgery several weeks later.

He also told Dr. Kuldjanov that at previous BOP facilities he had been prescribed Gabapentin and it had helped with his pain. Based on this information, Dr. Kuldjanov prescribed Gabapentin. There was a disagreement between Ahmed and Kuldjanov over this prescription. Kuldjanov believed that Gabapentin was an appropriate prescription for Galindez because Galindez claimed it had worked for him in the past. However, Gabapentin was not FDA approved for the treatment of Galindez's symptoms. Additionally, Gabapentin has possibly severe side effects, such as fatal overdoses. Moreover, Gabapentin produces an intoxicating effect and is highly addictive. For these reasons, Gabapentin was abused by inmates, which led to trafficking and extortion. In response to that abuse, the BOP implemented additional restrictions for the use of Gabapentin. Ahmed also disagreed with the prescription of Gabapentin

on a medical level.[3] Regardless, after the surgery, the surgical discharge paperwork from Dr. Kuldjanov explicitly stated the Gabapentin should be discontinued. After Ahmed discussed the use of Gabapentin with providers at the hospital, it was agreed that pain management medications would still be required, but Gabapentin would not be among them.

On May 10, 2021, Galindez underwent surgery. Kuldjanov tried several times to remove the hardware, with no success. Kuldjanov opted instead to remove the tip of the nail and the interlocking screw. Kuldjanov was also able to remove some of the bone growth around the area. There were no other complications with the surgery. Galindez was given the medications prescribed, was scheduled for a follow-up in two weeks, and the jail's medical staff did regular wound checks and dressing changes as required.

On June 2, 2021, Ahmed and RN Kelley spoke to Galindez over the phone. Galindez indicated that he could not put his full weight on his leg and, therefore, was not able to complete his physical therapy exercises. The jail's medical staff emphasized the importance of physical therapy exercises. Galindez was operating under the erroneous belief the rod had been entirely removed. Ahmed explained that only a small portion of the hardware was removed and that an x-ray should be done to verify the structural integrity of his leg post-surgery. Initially Galindez refused, but on June 8, 2021, Galindez consented to the x-ray. The x-ray noted that the structural integrity remained the same and there were no abnormalities.

On June 17, 2021, Ahmed saw Galindez again. He was using crutches and was able to put his full weight on his leg, but only for short periods of time. Ahmed moved forward with pain management, including the Lidocaine patches. Galindez also requested additional physical therapy, but, when Ahmed discussed bringing a physical therapist in to further educate Galindez

---

[3] Dr. Ahmed believed the evidence supporting the use of Gabapentin for musculoskeletal pain was anecdotal and insufficient.

8

on exercises to do, Galindez responded that he understood the exercises and was already doing those exercises in his cell. Therefore, no additional physical therapy was requested.

On August 16, 2021, Ahmed followed up with Galindez again. His ambulation continued to improve. He asked for one of his medications (Flexeril) to be continued. Ahmed told Galindez that Flexeril cannot be used long-term, but Ahmed "agreed to continue it for 30 more days based on [Galindez's] report that it assisted his comfort level during PT exercises." (Doc. 39, Ex. A).

Over the next few months Ahmed saw Galindez several times. The general theme of these visits were that Galindez's condition would improve, but would not be at the level desired or Galindez would still complain of some pain. Galindez would ask for more medication and Ahmed would reiterate to Galindez that the medications he had been prescribed after the surgery could not be continued long-term. When Ahmed could provide short-term medication prescriptions, he did.

Eventually, Galindez sought to ween himself off the pain medication, but would ask for further muscle relaxants on an intermittent basis. Some of those prescriptions have been extended and approved for longer term use. However, Galindez continues to experience discomfort and while he has made significant improvements since the surgery, he has been advised that he will probably have chronic pain. Dr. Ahmed has requested an offsite EMG to determine if Galindez's pain is nerve related. That test is scheduled "for the near future." (Doc. 39, Ex. A).

## II.   LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is only proper "if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." *Dynegy Mktg. & Trade v. Multi Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (citing FED. R. CIV. P. 56(a)) (internal quotation marks omitted). A material fact is one that is outcome determinative under applicable law, and a genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the burden of demonstrating—based on the pleadings, affidavits, and other information submitted—the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a proper motion for summary judgment is made, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. Pro. 56(e)(2)). A party can successfully oppose summary judgment by presenting definite, competent evidence to rebut it. *Szymanski v. Rite-Way Lawn Maintenance Co., Inc.*, 231 F.3d 360, 364 (7th Cir. 2000).

When presented with a summary judgment motion, the Court considers the facts in the light most favorable to the non-moving party. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). All reasonable inferences and doubts are resolved in favor of the non-movant. *Id*. Even if the material facts are not in dispute, summary judgment is inappropriate when the information before the Court reveals that "alternate inferences can be drawn from the available evidence." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), *abrogated on other grounds by Spiegla II*, 481 F.3d at 966 (7th Cir. 2007).

### B.  Eighth Amendment *Bivens* Claims by Convicts

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. IIX. While the Eighth Amendment "forbids cruel and unusual punishments; it

does not require the most intelligent, progressive, humane, or efficacious prison administration." *Lee v. Young*, (7th Cir., 2008) (quoting *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995)).

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 388 (1971), allows plaintiffs to pursue constitutional claims against individual federal officers for violations of their rights. Plaintiffs may bring Eighth Amendment claims of inadequate medical care against federal officers pursuant to *Bivens*. *See Green v.Carlson*, 581 F.2d 669, 673 (7th Cir. 1978) (recognizing an implied damages remedy for constitutional claims of deliberate indifference to a serious medical condition under the Eighth Amendment against federal agents). To establish that their right under the Eighth Amendment against inadequate medical care was violated, a convict must show that (1) he or she had an objectively serious medical condition ("objective component") and that (2) the defendant(s) showed deliberate indifference to that condition ("subjective component"). *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The subjective component, deliberate indifference, is not the test for medical malpractice. *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). Rather, it requires that the defendants disregarded the plaintiff's serious medical condition. *Id*. This is not a mere difference of opinion on treatment options, *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001), but "something approaching a total unconcern" for the convict's welfare. *Collins*, 462 F.3d at 762. A plaintiff is not required to "prove that his complaints . . . were 'literally ignored,'; rather, he must show only that [the] defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (quoting *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008)).

III.   **ANALYSIS**

The Defendants have conceded that Galindez had an objectively serious medical

11

condition. Therefore, Galindez satisfies the objective component of the Eighth Amendment test. The only questions remaining are whether there is a genuine dispute of material fact and whether a reasonable juror could find that the Defendants were deliberately indifferent to Galindez's condition.

Galindez claims that the pain he faced was unbearable, (Doc. 43), and that the Defendants did not do all in their power to prevent or stop the pain he suffered. In his filings, Galindez claims that he was barely able to walk or put weight on his leg. Galindez believes that because the surgery was performed, this "confirm[ed] Dr. Ahmed's deliberate indifference." (*Id*.). He states that when he was finally referred to an orthopedic surgeon, the surgeon confirmed that he required "urgent surgery" to correct the hardware. (*Id*.).

Given Galindez did not complain of pain until February 2020, the surgery was not performed until May 2021, and Galindez does not appear to claim deliberate indifference after the surgery, the Court will only analyze his claims from that time. Galindez believes that the year-long delay between his complaint and the surgery, a refusal to provide a cane or crutches before the surgery, and refusal to prescribe Gabapentin amounted to deliberate indifference. Galindez's responses to the motions for summary judgment claim that he still suffers from pain. His responses, however, do not deny many of the material facts in the Defendants' motion. Accordingly, the Court will assume that Galindez concedes the facts he does not dispute.

### A.    PA Schneider

Here, the question is whether the undisputed facts can support a finding that Schneider's actions approached a "total unconcern" for Galindez's condition. Galindez's initial complaint states only the following concerning Schneider:

> [O]n June 5, 2020, [Schneider] came by [Galindez's unit] to make her sick call rounds[,] at which time [he] called for her assistance[. He] asked her why [he had]

12

> not been seen nor [received] medical attention[. Her] answer was that it was
> impossible to attend to [his] case because [the] metal rod and screw [have] been in
> [Galindez's] leg for a long time[,] there [was] no way [he] could have the pain in
> [his] leg, which [was] totally false because [he was] in extreme pain and [he was]
> in need of medical attention.

(Doc. 1). Galindez does not address PA Schneider in his responses to either of the summary

judgment motions. Rather, he directly, and only, addresses Dr. Ahmed in those responses; he

addresses Dr. Ahmed by saying "you" several times, but does not mention PA Schneider.

(Docs. 33, 43).

To begin, the Court finds it dubious that any medical professional would state with

certainty that chronic pain is impossible—especially when chronic pain is common with those in

Galindez's condition. It seems more likely that, when asked, Schneider told Galindez that there

was no way to fully *resolve* Galindez's chronic pain because it was impossible to remove the

hardware. Given the language barrier, it is easy to see how such a statement could have been

misunderstood by Galindez as stating that there was no way for him to experience pain.

Additionally, it seems counterintuitive that Schneider would, in one breath, claim that it was not

possible to help Galindez because the hardware was too old to be removed and then in the next

breath state that there was no way Galindez could experience pain from the old hardware.

However, *even if* Galindez did not misunderstand her and Schneider genuinely believed

there was "no way" Galindez could be experiencing pain, she still scheduled Galindez for a

follow-up appointment with PA Mills. PA Mills had already been working with Galindez on his

condition. Galindez seems to imply that PA Schneider's statements to him alone amount to

deliberate indifference. Assuming for the sake of argument that PA Schneider believed that there

was no way Galindez could be experiencing pain—merely summarizing her impression of his

condition and providing her medical opinion that there was no evident reason for him to be

experiencing pain are insufficient to establish deliberate indifference.

13

Galindez may argue that PA Schneider was deliberately indifferent by failing to take on his care. However, there is no indication that PA Schneider's role was to regularly see to individual inmates. Yet, even were PA Schneider in a position to work with Galindez on his underlying condition, common sense dictates that it would be unwise for more than one medical practitioner to be in charge of caring for the same patient, for the same issue, at the same time. Additionally, there was no indication that PA Mills's care was insufficient enough to require PA Schneider's intervention. The only reason Galindez's follow-up appointment was cancelled was due to COVID-19. PA Schneider did not play a role in that cancellation and, shortly thereafter, Galindez began seeing Dr. Ahmed directly.

Even if Schneider told Galindez that there was no way he could be experiencing pain, Schneider was not Galindez's caretaker and therefore was in no position to treat Galindez. Regardless, Schneider still took the initiative of scheduling him for a follow-up with the PA assigned to Galindez and left a note for him apprising him of Galindez's concerns. Schneider did not show anything approaching a "total unconcern" for his condition nor are her actions the conduct of a physician deliberately indifferent to his condition. Accordingly, the Court finds that PA Schneider was not deliberately indifferent and that no reasonable jury could determine otherwise. Therefore, Schneider is entitled to summary judgment.

### B.    Dr. Ahmed

While Dr. Ahmed was the jail's clinical director, because *Bivens* actions do not permit respondeat superior liability, *Lojuk v. Quandt*, 706 F.2d 1456, 1468 (7th Cir. 1982), Dr. Ahmed is only liable for deprivations he was personally responsible for. The core of Galindez's complaint is that he was not referred to surgery quickly enough, that Ahmed should have provided him with crutches or a cane beforehand, and that he should have been prescribed

14

Gabapentin.

Again, the Eighth Amendment "does not require the most intelligent, progressive, humane, or efficacious prison administration." *Lee v. Young*, 533 F.3d 505, 511 (quoting *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995)). Neither does the Eighth Amendment entitle convicts to whatever medical care they want, whenever they want it. Rather, the Eighth Amendment is a floor for medical treatment, that is, it protects against inadequate medical treatment—specifically deliberate indifference on the part of medical personnel for a convict's serious medical condition. To prevail, Galindez must show that Dr. Ahmed's responses to his condition "were so plainly inappropriate as to permit the inference that [he] intentionally or recklessly disregarded his needs." *Haywood v. Hathaway*, 842 F.3d at 1031. Based on Galindez's initial complaint and responses to the summary judgment motions, the Court finds there are no genuine disputes of material fact.

Dr. Ahmed saw Galindez numerous times, at regular intervals. Ahmed ordered multiple x-rays and none of the x-rays indicated a cause for his pain. Without an evident cause for the pain, in Dr. Ahmed's medical judgment, pain management—not surgery—was the appropriate first step. Only when pain management options proved ineffective would Dr. Ahmed recommend surgery. It is well known that surgery can be very dangerous and chronic pain is unfortunately common in individuals with old hardware. Rather than relieve chronic pain, surgery may exasperate it. Given the nature and age of Galindez's injury, including the bone growth around the hardware, surgery presented even more risks. Dr. Ahmed tried to proceed with a conservative pain management approach first, but, Galindez refused to medicate. Galindez wanted to move

straight to surgery. Galindez's refusal to cooperate delayed his own treatment.[4] Ahmed spent nearly an hour on the phone with Galindez discussing his condition and treatment options, with an interpreter, to try and get through to him, to no avail. A doctor who spends nearly an hour speaking through an interpreter to talk to their patient, orders multiple x-rays, counsels against surgery for reasons unique to their patient, and advises their patient of the risks of surgery; is a far cry from being "totally unconcerned" about their patient's condition.

Eventually, Galindez relented and agreed to start a pain medication regimen. It was only when he relented that Dr. Ahmed could attempt to resolve the issue without surgery. Dr. Ahmed saw Galindez regularly—at near sixty-day intervals—and adjusted the dosages and medications according to Galindez's responses, even absent external corroborating signs of the pain. After trying several different medications, Dr. Ahmed determined that pain management had been exhausted and recommended Galindez see an orthopedist. Ahmed tailored his approach to Galindez's situation, worked with him to try and resolve his pain, tried several medications, and only then recommended surgery.

Dr. Ahmed's actions are not the actions of a doctor who knowingly, intentionally, or recklessly disregarded the needs of their patient. While Galindez may have disagreed with waiting for surgery, as his orthopedic surgeon advised, surgery carries significant risks. Contrary to Galindez's assertion, the orthopedic surgeon did not indicate that he required "urgent surgery." (Doc. 43). Galindez's hardware was nearly thirty years old, there had been bone growth around the hardware, and it was unclear whether removing it would re-shatter the bone— if the hardware could be removed at all. Dr. Ahmed pointed all of this out to Galindez and also

---

[4] Galindez was prescribed medication, but he refused to cooperate with taking that medication on a regular basis— insisting on surgical removal as the only solution. While Galindez later reported side effects to this medication, it does not appear he reported side effects to the medication contemporaneously to them being prescribed.

informed him that standard medical practice did not suggest reaching for surgery immediately. The Eighth Amendment provides for adequate medical care, it does not provide convicts with the right to a surgeon whenever they wish.

Moreover, by refusing to refer Galindez to a surgeon immediately, Dr. Ahmed *was* showing concern for Galindez's condition and his general welfare. Dr. Ahmed was aware of the dangers of surgery; he was aware that a surgery could exasperate Galindez's condition, that there could be unforeseen complications, that the hardware probably could not be removed, and that Galindez would likely still suffer from chronic pain. Surgery is usually a measure of last resort—even for non-prisoners. Indeed, even were Galindez seeing Dr. Ahmed in a civilian context, it is difficult to imagine that Dr. Ahmed, or any medical doctor, would jump to surgery for chronic musculoskeletal pain when x-rays indicated nothing abnormal and Galindez displayed no outward signs of discomfort or limited ambulation. Far from being "plainly inappropriate" to reach for more conservative options before surgery, it seems "plainly inappropriate" to refer patients directly to a surgeon, without corroborating medical evidence and before exploring chronic pain management options first.

Furthermore, the Court cannot ignore that, ultimately, Dr. Ahmed was proven right. Galindez received the surgery he wanted, but the orthopedic surgeon could not remove the hardware—as Dr. Ahmed foresaw and forewarned. Galindez is still recovering from the surgery today and Galindez is still reporting chronic pain. It is unclear what marginal benefit the surgery even had when, three years down the line, Galindez is still reporting chronic pain and asking for the pain medication—medication that he initially, obstinately refused to take. For all these reasons, the Court finds that the delay between Galindez's reports of pain and the surgery do not amount to deliberate indifference and that no reasonable juror could find otherwise.

17

Turning to the question of Gabapentin, Galindez states multiple times that he's seen other doctors that have prescribed it to him in other penal institutions. However, as Dr. Ahmed points out, Gabapentin was discontinued in most contexts because it was highly addictive, prone to abuse—particularly in prison environments—is not approved by the FDA for treating musculoskeletal pain, there is only out-of-date anecdotal evidence that off-label use of it works for musculoskeletal pain, and BOP policy restricts Gabapentin to short-term use, requiring regional approval. Any one of these reasons in isolation would have been good cause to deny Galindez's request for an unlimited supply of Gabapentin; all of them combined is more than sufficient—especially when Galindez refused other medications. Again, the Eighth Amendment provides a floor for medical care; it is not a blank check for inmates to receive whatever medications they want, whenever they want them. Therefore, Dr. Ahmed's refusal to prescribe Galindez Gabapentin does not demonstrate deliberate indifference towards his condition.

As for Galindez's claim that Dr. Ahmed would not get him crutches or a cane early on: Galindez is in prison. Ordinary objects being used as weapons is an unfortunate reality of prison life. It is difficult to imagine any sort of crutch or cane sturdy enough to support Galindez's movement that could not also double as a dangerous weapon. While there are situations where prisoners require a walking aid, these are cases where assistance is required—Galindez did not require that assistance. While Galindez complained of pain, he showed no signs that he was constricted in his ability to place weight on his leg or impaired in his ability to walk. When a patient does not show any observational signs of needing a cane or a crutch—in an environment where toothbrushes and reading glasses are used as weapons—it is difficult to imagine *any* jail administrator or jail doctor providing a cane or crutch without medical necessity. The Court sees no evidence that denial of walking aids to Galindez was deliberately indifferent.

18

In short, Dr. Ahmed's actions were neither unreasonable nor did they demonstrate anything close to approaching deliberate indifference. Galindez delayed his own treatment by refusing medication initially. When Galindez relented to pain management, Dr. Ahmed took immediate action and began the process of evaluating if certain medications would work— meeting at regular intervals to reevaluate and adjust. Rather than displaying deliberate indifference, Dr. Ahmed's actions have bordered on the exemplary—even by civilian standards. Dr. Ahmed's actions showed a concern for Galindez's long-term health and recovery, even after surgery. Not only are Dr. Ahmed's actions well above and beyond the "floor" of deliberate indifference, Dr. Ahmed's medical judgment on Galindez's pain being a chronic issue requiring pain management was vindicated: the surgery was ultimately unsuccessful—both because the hardware could not be removed and because Galindez's pain persists to this day.

For all these reasons, the Court finds that there are no genuine issues of material fact, that Dr. Ahmed was not deliberately indifferent, and that no reasonable jury could find otherwise. Accordingly, Dr. Ahmed is also entitled to summary judgment.

## IV.    <u>CONCLUSION</u>

Finding that there are no genuine disputes of material fact and that neither Dr. Ahmed nor PA Schneider were deliberately indifferent to Galindez's condition, the Court hereby **GRANTS** the motion for summary judgment, (Doc. 39), and **DIRECTS** the Clerk of Court to enter judgment in favor of the Defendants.

**IT IS SO ORDERED.**
**DATED:  May 16, 2024**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**

19